UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Appellant, | ) ) | No. 1:16-cv-00161-SEB-MJD |
| vs. | ) ) | |
| EDWARD LEE CALVERT, | ) ) | |
| Appellee. | ) | |

## ORDER ON BANKRUPTCY APPEAL

Presently before the Court is an appeal by the National Labor Relations Board ("NLRB") [Docket No. 1], filed on January 20, 2016, challenging the decision of the Bankruptcy Court issued on December 21, 2015. For the reasons detailed below we AFFIRM the Bankruptcy Court's decision.

## Factual Background

Debtor-Appellee Edward L. Calvert was the sole owner and president of ELC Electric Inc. (the "Company"), an electrical contracting company operating in the Indianapolis area. In July 2002, the International Brotherhood of Electrical Workers, Local 481 (the "Union") sought to become the certified bargaining representative for the Company's rank-and-file electricians.  An election to determine whether a majority of the electricians desired to be represented by the Union was scheduled by the NLRB for September 26, 2002. Prior to election, Calvert became aware that the rank-and-file

1

electricians were attempting to organize; thus, in anticipation of the upcoming election, Calvert launched a campaign against the Union's certification because he wanted the Company to remain union-free.

On September 26, 2002 the Union lost the election, failing to gain a majority of support from the electricians. Shortly thereafter, the Union filed objections with the NLRB alleging that the Company had engaged in conduct that unduly influenced the election results in violation of the National Labor Relations Act (the "Act"), 29 U.S.C. § 101, *et seq.*

Following the Union's loss in the September 2002 elections, but prior to any decision by the NLRB on the challenges to its results, in January, February, and March of 2003, the Company laid off sixteen of its bargaining-unit electricians and promoted the only two remaining electricians, leaving the Company with no rank-and-file workforce.

Calvert testified that he understood that by laying off the rank-and-file electricians, the Company would no longer have obligations to pay them or provide them with other benefits such as health insurance or retirement contributions. In addition, it was his understanding that the layoffs left the Company with no rank-and-file employees who could form a bargaining unit, but that, at the time he made the decision to lay off the electricians, he did not know whether there would be future attempts to unionize workers at the Company.

He testified further that the Company had laid off the employees to save money. Specifically, at the time of the layoffs, the Company was contracted for several

"prevailing wage projects" such as schools and hospitals for which the Indiana Department of Labor was conducting audits that were costing the Company money and manpower, and which would, according to Calvert, "inevitably" lead to the Department discovering a problem with the Company's payment of wages, provision of benefits, or classification of workers. As a result, the Company chose to shift its operations to the use of temporary workers, whereby the Company would contract with an outside labor provider, who would be responsible for the provision of wages, benefits, and taxes, and, most importantly, would be responsible for any further audits by the Indiana Department of Labor. According to Calvert, this decision "saved the Company a ton of money." Bankr. Dkt. 56 at 6. The Company sent each of the affected workers a letter explaining the decision on March 7, 2003, a week prior to the layoffs.

In response to the early 2003 layoffs, the Union filed additional charges with the NLRB alleging that, by discharging the entire rank-and-file workforce, the Company had unlawfully discriminated against its electricians for engaging in their statutorily-protected right to organize. Pursuant to the charges filed by the Union, the NLRB instituted administrative proceedings against the Company for alleged violations of §§ 8(a)(1) and (3) of the Act. A trial was conducted in Indianapolis before an Administrative Law Judge ("ALJ") appointed by the NLRB, and, on April 7, 2004, the ALJ issued a decision holding that the Company's actions had violated §§ 8(a)(1) and (3) of the Act. On July 29, 2005, the NLRB affirmed the ALJ's rulings, findings, and conclusions as modified,

adopted the recommended order as modified, and adopted the ALJ's recommendation that the September 26, 2002 election be set aside and a new election be held.

In reaching its conclusion that the Company, through unfair labor practices, had interfered with the election results, requiring that they be set aside and a new election be held, the NLRB found that the Company discriminatorily discharged all sixteen of its bargaining-unit employees and that Calvert had personally made the decision to discharge the Company's thirteen electricians on March 14, 2003.[1] The NLRB also found that Calvert's intent in discharging these employees was to thwart their pursuit of union representation, given that he continued to avail himself of their services after their termination by contracting with the labor contractors for whom they worked. The NLRB also noted that it was unpersuaded by Calvert's explanations for the Company's actions, finding instead that Calvert's actions were based on unlawful antiunion animus. The NLRB ordered the Company, its officers, agents, successors, and assignees, to make whole through the payment of backpay the sixteen employees who had been unlawfully discharged in violation of the Act.

On March 25, 2006, nearly eight months after the NLRB ordered the payment of backpay, the Company ceased operations, prompting the NLRB to conduct a subsequent proceeding intended to address who was to become responsible for paying the Company's backpay liability. On November 8, 2012, an ALJ issued a Supplemental

---

[1] The record does not reflect who made the decision to layoff three of the sixteen bargaining-unit employees in January and February 2003, only that Calvert, as president, made the decision on March 14, 2003 to either promote or layoff the remaining rank-and-file workers.

4

Decision and Order finding that Calvert had created new corporate identities for the express purpose of avoiding the Company's liability for payment under the NLRB's original order, that the new corporate identities were alter-egos of the Company, and that Calvert had disregarded the separateness of the corporations and comingled and diverted funds in order to "evade his legal obligations to the backpay owed to the 16 discriminatees." Tr. Ex. 4 at 15. The ALJ held that the corporate veil should be pierced and Calvert should be held personally liable for $437,427 in backpay and interest to be paid to the sixteen discharged employees. The Order was modified, affirmed, and enforced by the Seventh Circuit on July 23, 2013. Tr. Ex. 5.

Five months thereafter, on December 19, 2013, Calvert filed a Chapter 7 bankruptcy petition seeking discharge of his debts. In response, the NLRB initiated the present adversary proceeding seeking to have its claim for the unsatisfied payment of backpay adjudicated as nondischargeable pursuant to 11 U.S.C. § 523(a)(6) and to have Calvert deemed ineligible for discharge pursuant to 11 U.S.C. § 727(a)(3) and (4).

On June 5, 2015, the NLRB moved the Bankruptcy Court for entry of summary judgment on grounds that its § 523(a)(6) claim for nondischargeability, which requires a showing of willfulness, deliberate injury, and malice, had been fully adjudicated in the NLRB's unfair labor practice proceedings and therefore the Bankruptcy Court should rely on the findings and conclusions in the NLRB's Decision and Order. The Bankruptcy Court denied the motion on September 1, 2015, holding that "the level of '*mens rea*' required for a determination of nondischargeability is not the same with respect to an

5

unfair labor practice determination under §8(a) of the National Labor Relations Act." Bank. Dkt. 39 at 4–5. Accordingly, the Bankruptcy Court held that the finding of antiunion animus in the NLRB decision did not necessarily compel a finding that Calvert had the subjective intent required by § 523(a)(6); however, the Bankruptcy Court held that any "specific findings" made by the ALJ with regard to Calvert's intent to cause injury to the electricians were entitled to preclusive effect under the doctrine of collateral estoppel, but upon review of the prior decisions, found that the NLRB adjudications lacked sufficient "specific findings" as to Calvert's intent so as to enable the Bankruptcy Court to give preclusive effect to the to the legal issues of liability and nondischargeability. The Bankruptcy Court held that it would instead analyze whether the facts proven at trial would support a conclusion of nondischargeability under § 523(a)(6) of the Bankruptcy Code.

A trial on the issue of nondischargeability was held on September 23, 2015, after which, on December 21, 2015, the Bankruptcy Court issued its Findings of Fact and Conclusions of Law, holding that, based on the evidence adduced at trial, Calvert's debt to the NLRB was not excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). The Bankruptcy Court concluded: (1) that Calvert's decision to promote or lay off all of the Company's bargaining-unit employees prevented them from exercising their legal rights to organize under the NLRA and therefore caused a cognizable injury under § 523(a)(6); (2) that Calvert understood that there would be no bargaining-unit employees who could exercise their legal right to organize at the Company once they were all either laid off or

6

promoted and therefore he acted with requisite willfulness under § 523(a)(6); and (3) that Calvert's testimony that the Company switched to temporary employees from labor providers in order to avoid costly audits by the Indiana Department of Labor in confluence with the fact that he made the decision to switch to temporary employees more than a year prior to the ALJ's decision to set aside the first election's results and order a second election sufficiently refuted the NLRB's claim that, at the time the decision to lay off the workforce was made, it was more likely than not that Calvert consciously disregarded the organizational rights of the Company's employees. See Bankr. Dkt. 56 at 14–15, ¶¶ 12–14. Accordingly, construing the exception to discharge strictly against the NLRB and liberally in favor of Calvert, the Bankruptcy Court held that "the NLRB did not prove by a preponderance of evidence that Calvert acted maliciously. The debt owed by Calvert is NOT excepted from discharge pursuant to § 523(a)(6)." *Id.* at ¶ 15.

On January 20, 2016, the NLRB appealed the Bankruptcy Court's decision arguing that the NLRB's determination made in the underlying labor proceedings that Calvert had unlawfully discriminated against the bargaining-unit employees for exercising their statutory rights should be given preclusive effect with regard to the issue of whether Calvert had acted "in conscious disregard of [his] duties or without just cause or excuse." See Dkt. 10 at 9. The appeal became fully briefed on May 2, 2016, and is now ripe for decision by this Court.

## Standard of Review

This Court has subject-matter jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1), which provides that "the district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees." Pursuant to Fed. R. Bankr. P. 8013, the District Court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." In reviewing a bankruptcy court's judgment, questions of law are reviewed *de novo* and the bankruptcy court's findings of fact are reviewed for clear error. *In re Salem*, 465 F.3d 767, 773 (7th Cir. 2008).

## Discussion

On appeal, the NLRB asks us to hold that the Bankruptcy Court erred in finding that the NLRB failed to prove by a preponderance of evidence that when Defendant-Appellee Calvert terminated his former employees he acted with the requisite malice to establish the nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(6).

For a debt to be nondischargeable pursuant to 11 U.S.C. § 523(a)(6), it must be the result of a "willful and malicious injury by debtor to another entity or to the property of another entity." The Seventh Circuit has defined "willful and malicious injury" as "one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolia v. Larson*, 677 F.3d 320, 324 (7th Cir. 2012). In analyzing whether a debt fits this description, bankruptcy courts within our Circuit focus on three points: (1) whether an

8

injury was caused by the debtor; (3) whether the debtor acted willfully; and (3) whether the debtor acted with malice. *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013). Throughout the analysis, the burden remains on the creditor (the NLRB) to establish these facts by a preponderance of evidence. *Id.*

Following a trial on this issue, the Bankruptcy Court found that Calvert's debt of $437,427 in backpay and interest to be paid to the sixteen discharged Company employees was the product of an injury to the employees, caused by Calvert, who acted willfully in causing the injury. See Bankr. Dkt. 56 at 14–15. The Bankruptcy Court declined the find, however, that the NLRB had proven by a preponderance of evidence that Calvert acted with the requisite malice in causing the injury, thereby satisfying the third prong of the § 523(a)(6) analysis and excepting the debt from discharge. *Id.* at ¶ 15.

The NLRB's primary argument on appeal is that the Bankruptcy Court failed to give appropriate preclusive effect to the underlying unfair labor practice proceedings in which the ALJ and NLRB determined that Calvert's company, ELC Electric Inc., had violated § 8(a) of the National Labor Relations Act. See Dkt. 10 at 11–14. At first blush it appears that the NLRB is appealing the Bankruptcy Court's legal conclusion contained within its order on summary judgment [Bankr. Dkt. 39] that, although the material facts presented in a nondischargeability adversary proceeding and an unfair labor practice proceeding may be similar, the level of *mens rea* needed to establish nondischargeability under § 523(a)(6) of the Bankruptcy Code is sufficiently distinct from that needed to prove an unfair labor practice under § 8(a) of the NLRA so as to require the Bankruptcy

9

Court to conduct its own analysis of dischargeability under § 523(a)(6), notwithstanding a prior determination of liability under § 8(a) of the NLRA. See Bankr. Dkt. 39 at 4–5 (citing *National Labor Relations Board v. Gordon (In re Gordon)*, 303 B.R. 645, 657 (Bankr. D. Colo. 2003)). But if the NLRB's position were truly that its prior determination of liability under the NLRA should be given preclusive effect with regard to the Bankruptcy Court's determination of dischargeability under the Bankruptcy Code, then its claim for collateral estoppel would necessarily call for an analysis of whether: (1) the issue sought to be precluded is the same as that involved in the prior proceeding, (2) the issue was actually litigated in that proceeding, (3) the determination of that issue was essential to the final judgment of the proceeding, and (4) the party against whom the preclusion is invoked was fully represented in the prior proceeding. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 547 (7th Cir. 2011) (citing *H–D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007)). Moreover, to determine whether the issues "involved" and "actually litigated" in the prior labor proceedings are the "same" as those at issue in the adversary bankruptcy proceedings, we would need to take a closer look at the underlying unfair labor practice decisions promulgated by the ALJ, NLRB, and Seventh Circuit to determine whether the NLRA analysis conducted in those proceedings "substantially mirrored the federal test for maliciousness " such that it should be given preclusive effect here. *Horsfall*, 738 F.3d at 775.

Yet the NLRB conducts none of the aforementioned analysis. Indeed, rather than discussing the analysis conducted in the underlying unfair labor practice proceedings,

with specific regard to the *mens rea* elements needed to prove a violation of § 8(a) of the NLRA, the NLRB simply makes vague reference to certain "findings" from those proceedings which it views as persuasive in its argument that the debt should be excepted from discharge. See Dkt. 10 at 13. Specifically, the NLRB references (without citation) the Board's findings that Calvert, on behalf of his company, acted out of antiunion animus in intentionally discharging Company employees to avoid future collective bargaining, which was unlawfully discriminatory under the NLRA. *Id.* The NLRB then abruptly concludes:

> The NLRB has found that Calvert terminated his employees unlawfully—to deprive them of their right under the Act—and, *a fortiori*, without just cause. Therefore, the maliciousness of the injury, as reckoned by the Seventh Circuit, is the same issue litigated in the underlying unfair labor practice proceeding.

*Id.* at 13–14. Again, in order to conclude that a determination of liability under the NLRA is the "same" as a finding of malice under § 523(a)(6) of the Bankruptcy Code for purposes of collateral estoppel, the Court would need to compare the methods of analysis germane to each statute and determine whether the they "substantially mirror" one another. It is the NLRB's burden to make such a showing, *see e.g., Cobin v. Rice*, 823 F. Supp. 1419, 1431 (N.D. Ind. 1993), but the NLRB has failed to do so; indeed, the NLRB has failed to even attempt to meet its burden by engaging in the necessary analysis. "It is the parties' duty to package, present, and support their arguments," *Roger Whitmore's Auto Srv. v. Lake Cnty.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005), and for good reason; for us to embark on an expedition through the records of the underlying labor and bankruptcy

11

proceedings in order to engage in a collateral estoppel analysis without it having been briefed before us would defeat the adversarial aims of our jurisdiction. Moreover, it would risk striking a severe unfairness to Calvert, the party against whom the NLRB seeks to offensively employ estoppel. As the D.C. Circuit Court of Appeals recognized, "The doctrine is detailed, difficult, and potentially dangerous." *Jack Faucett Assocs. v. AT&T*, 744 F.2d 118, 124 (D.C. Cir. 1984). The effect of its acceptance is, in essence, to close the courthouse doors to a party with regard to a particular claim or issue, which is why the doctrine's use is limited to only those situations where that party has already received a "full and fair" opportunity to litigate its claims, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). An issue carrying such grave consequences requires full analysis by the parties and the court. Because the NLRB has provided us no analysis of the elements of collateral estoppel, nor has it provided with specific citation the materials needed to conduct such an analysis, we are ill-equipped to rule on this issue. Accordingly, we leave undisturbed the Bankruptcy Court's ruling regarding the preclusive effect of the NLRB's determination of liability for violations of the NLRA. See Bankr. Dkt. 39.

Alternatively, the NLRB appears to take the position that, in reaching its conclusion that Calvert did not act with the malice required to except the debt from discharge pursuant to § 523(a)(6), the Bankruptcy Court must have failed to give appropriate weight to the factual findings made in the prior proceedings. See Dkt. 10 at 13 ("the Bankruptcy Court erred here by analyzing the maliciousness of Calvert's

conduct without deference to the administrative record in the prior unfair labor practice proceeding."). It is somewhat unclear what deference the NLRB believes the administrative record is due. In its order on summary judgment, the Bankruptcy Court held that a ruling of liability under the NLRA does not compel a ruling of dischargeability under § 523(a)(6), but it went on to state that "'[i]f the ALJ made specific findings of fact with respect to the [debtor's] intent as to the employees,'" those findings would be given preclusive effect and accepted as binding upon the Bankruptcy Court. See Bankr. Dkt. 39 at 5 (quoting *In re Gordon*, 303 B.R. at 657). However, the Bankruptcy Court's review of the underlying labor proceedings revealed that the only finding of fact made by the ALJ with regard to Calvert's intent was that Calvert acted out of "antiunion animus" in discharging the employees. *Id.* at 5–6. Because this finding of antiunion animus, alone, was insufficient to establish maliciousness under § 523(a)(6), the Bankruptcy Court denied the NLRB's motion for summary judgment and stated that it would "analyze whether the facts proven at trial, particularly with respect to the intent of Calvert to harm the subject employees, will support a conclusion of nondischargeability." *Id.* at 6.

We have no indication that the Bankruptcy Court discarded the NLRB's finding of antiunion animus in weighing the evidence here. Rather, it appears that the only new evidence adduced at trial was that, following the Union's loss in the September 2002 election, Calvert's company switched to temporary employees in order to avoid the costs associated with any further audits being conducted by the Indiana Department of Labor,

but that, at the time he made the cost-saving decision, he was unaware that the ALJ would, a year later, order a new election or that the ALJ's decision would be affirmed two years later by the NLRB. See Dkt. 11-4 at ¶ 14. Weighing the NLRB's finding of antiunion animus (which the Bankruptcy Court had already stated could not by itself establish malice) against this newly-developed evidence regarding Calvert's motives and knowledge, the Bankruptcy Court held:

> The NLRB did not present evidence from which the Court can conclude that, at the time the decision was made, it was more likely than not that Calvert consciously disregarded the organization rights of the Company's employees when Calvert presented uncontroverted evidence of a legitimate business reason for the layoffs/promotions.

*Id.*

"The question whether an actor behaved willfully and maliciously is one of fact." *Horsfall*, 738 F.3d at 776. As such, we must accept the Bankruptcy Court's finding that Calvert did not act maliciously within the meaning of the dischargeability exception so long as that finding is not "clearly erroneous." *See Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994); *see also* 11 U.S.C. § 523(a)(6); Fed. R. Bankr. P. 8013. "Under this standard, if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighed the evidence differently as trier of fact." *Matter of Love,* 957 F.2d 1350, 1354 (7th Cir. 1992). Indeed, reversal under the clearly erroneous standard is only warranted if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id., citing, EEOC v. Sears, Roebuck &*

*Co.,* 839 F.2d 302, 309 (7th Cir. 1988). We are left with no such conviction here. It appears that the Bankruptcy Court was persuaded by the testimony elicited from Calvert during his trial that, at the time he made the decision to eliminate his full-time workforce in favor of less-expensive temporary workers, he did not know whether there would be a union going forward, nor was he aware that the NLRB would throw out the September 2002 elections results, find that his company engaged in unlawful conduct under the NLRA, and order a new elections to be held, but instead he believed that the switch was a legitimate cost-saving measure. See Bankr. Dkt. 56. As the Seventh Circuit instructs, "We must be especially deferential toward a trial court's assessment of witness credibility." *Horsfall*, 738 F.3d at 776. With that deference in mind, we do not find the Bankruptcy Court's conclusion to be clearly erroneous. Accordingly, we accept the Bankruptcy Court's finding that the NLRB failed to establish by a preponderance of evidence that Calvert acted with the requisite malice to except his debt owed to the Company's former employees from dischargeability pursuant to 11 U.S.C. § 523(a)(6).

## Conclusion

For the reasons detailed above, the Bankruptcy Court's ruling is <u>AFFIRMED</u> in all respects. Final judgment shall issue accordingly.

**IT IS SO ORDERED.**

Date: __3/31/2017__

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

15

Distribution:

Dustin R. DeNeal
FAEGRE BAKER DANIELS LLC -- Indianapolis North
dustin.deneal@faegrebd.com

Harmony A. Mappes
FAEGRE BAKER DANIELS LLP (Indianapolis)
harmony.mappes@faegrebd.com

William R. Warwick
NATIONAL LABOR RELATIONS BOARD
william.warwick@nlrb.gov

Dalford D. Owens, Jr.
NATIONAL LABOR RELATIONS BOARD
dean.owens@nlrb.gov